IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

DAVID BLOUNT                        :

    Plaintiff            `       : Case No. 3:15-cv-2102

    v.                          : (Judge Richard P. Conaboy)

CAROLYN W. COLVIN                   :
Acting Commissioner of
Social Security                     :

    Defendant

_____

### Memorandum

We consider here the appeal of David D. Blount from a decision
of the Social Security Administration ("Agency" or "Commissioner")
that denied Plaintiff's application for Disability Insurance
Benefits ("DIB").  The agency's ruling of September 3, 2015 upheld
the prior decision of one of its administrative law judges.  That
decision had denied Plaintiff's claim.  The agency's decision is
final, and thus, confers jurisdiction on this Court pursuant to 42
U.S.C. § 405(g).  The parties have fully briefed (Docs. 12, 17 and
19) the issues and this matter is ripe for disposition.

## I.   Procedural Background.

Plaintiff filed his Complaint (Doc. 1)in timely fashion on
November 1, 2015.  He alleges an onset date of December 2, 2011.
He contends that the agency's findings of fact and conclusions of
law are unsupported by the requisite substantial evidence and
contrary to law.  Plaintiff requests that this Court either: (a)

1

reverse the decision and direct an award of DIB in his favor; or (b) remand this matter to the agency for a new hearing and further administrative proceedings.  (Doc. 1 at 3-4).

## II.  Factual Background.

### A.    Testimony Before the ALJ.

The sole hearing in this matter was conducted on May 19, 2014. The hearing was conducted by ALJ Sharon Zanotto.  Present were the Plaintiff, his attorney, and Brian Byerly, a vocational expert. The testimony may be summarized as follows.

Plaintiff stated that he was born on December 2, 1961 and that he would be 53 years of age on his next birthday.  (R.at 41).  He is married and lives with his spouse in a two-story townhouse.  He has lived at the same address since 2000.  Prior to the onset of his disability (December 2, 2011) he last worked at Fisher Auto Parts where he was employed as a truck driver.  (R.42).  While at Fisher Auto Parts, Plaintiff drove a variety of different trucks and his job also demanded that he help with loading and off-loading freight.  Despite the availability of dollies and jacks, the work was of a heavy exertional type.  (Id.).

During the last seven (7) years that Plaintiff worked for Fisher Auto Parts he also worked for Central Parking at the Dauphin County Airport as a part-time employee on week ends.[1]  (R.42-44).

_____

[1] Plaintiff's hand-written appeal to the agency's Appeals Council indicates that he worked 16 years for Fisher Auto Parts before incurring a work-related injury that precluded further employment

The nature of Plaintiff's work with Central Parking was not specified. (Id.).  When asked why he had left his job at Fisher Auto Parts, Plaintiff explained that he hurt himself at work and was instructed by his employer to see his doctor for treatment. (Id.).  His employer then filed a Workman's Compensation claim on his behalf in August of 2011 and Plaintiff received those benefits until September of 2012 when he settled his claim by Compromise and Release.  (R.45).  Plaintiff testified that he made one attempt to go back to work for Fisher Auto Parts after being injured in August of 2011.  He was assigned as a truck driver at that time and was given a co-worker to help him.  He was unable to complete even one shift because driving through construction zones exacerbated his back pain and he was forced to return to his employer's place of business.  (R.46).

Plaintiff stated that he has been looking for work since August of 2011, including work as a truck driver or warehouseman at numerous locations.  He was refused employment by each of these employers because they were reluctant to hire a man who had filed a successful workman's compensation claim.  Plaintiff stated further that he often consults two different web sites to help him find a job.  He has also tried to get jobs with employers who offer work involving light freight, like "letter packs" but even employers who offer such work are reluctant to hire him because of his workman's

there.  (R.14-15).

compensation history.  (R.47-50).

Plaintiff testified further that he did not look for work immediately after suffering his work-related injury in August of 2011.  Rather, he waited until he had completed a regimen of physical therapy with the Grandrimo Group under the direction of Dr. John Grandrimo.  Plaintiff stated that if an employer did offer him a job as a truck driver in some capacity he does not know whether he would be able to perform it.  He also explained that, because he has not worked for a long time, his CDL license has been downgraded to a CDL Type II.  If he were to again drive large rigs he would have to pass a physical exam to gain full CDL status once again.  He does not know whether he would be able to pass such a physical exam but he stated that he would certainly try his best. (R.50-53). Dr. Grandimo did not recommend surgery for his injury because he believed surgery might make Plaintiff's back symptoms worse.  Plaintiff stated that he uses a cane to aid in walking and balancing and, sometimes, to get up from a seated position.  He can no longer make quick moves and must change positions slowly and methodically to avoid aggravating his back pain.  He cannot carry anything heavier than a one gallon jug of water.  When he shops he picks up lighter items.  When "real grocery shopping" is necessary he waits until one of his wife's nieces is available to help him. (R.53-54).

Plaintiff does not think that he can stand in one spot for

4

more than 20 minutes at a time.  He stated further that he cannot
sit for more than 20-30 minutes at a time without getting up.  His
wife has Parkinson's disease and requires a great deal of
assistance from him.  He generally has to help her do everything
including getting her out of her chair and helping her get to the
bathroom.  Plaintiff stated that for most of the last ten years he
has cared for his wife without the assistance of others.  Since his
injury, his sister-in-law and her children "stop by and help me out
quite a bit".  Nevertheless, he stated that he is "her primary main
care provider".  In providing her care he moves her to the
bathroom, changes her, and bathes her.  He reiterated, "I do
everything for my wife."  Plaintiff also explained that the only
things he requires help with to run his household are heavy grocery
shopping, running the vacuum cleaner, and carrying the laundry up
the stairs.  He stated that he has not been able to do those tasks
since his onset date of December 2, 2011.  (R.55-60).  Upon
questioning by his attorney, Plaintiff clarified that he does not
lift his wife, but merely helps her to balance.  Once he gets her
balanced she ambulates with the use of a walker.  (Id.).

Mr. Byerly, a Vocational Expert, also testified.  He stated
that Plaintiff's past relevant work as a truck driver was
classified as "medium, semi-skilled".  The ALJ asked the vocational
expert to respond to a hypothetical question that assumed Plaintiff
could do the full range of light work but for the need to alternate

between sitting and standing, the need to use a cane to stand and walk, and the need to stoop, kneel, crouch, climb and climb stairs only occasionally.  The vocational expert responded that, given those limitations, there was no light work that Plaintiff could perform.  Similarly, the vocational expert stated that, due to Plaintiff's lack of transferable skills, he would be unable to do sedentary work with the limitations the ALJ had asked him to assume.  (R.60-64).

### B.   Medical Evidence.

### Dr. Stephen DeLuca

Dr. DeLuca, an orthopedic surgeon, saw Plaintiff initially on August 12, 2011, just three days after he hurt his back while on the job with Fisher Auto Parts.  Dr. DeLuca noted the following on that date: (a) Plaintiff had a normal gait and his bilateral straight-leg raising test was negative; (b) his motor strength and reflexes were intact; (c) he was able to heel and toe walk without difficulty; (d) he was tender in his thoracolumbar spine; and (e) x-rays of his lumbar and thoracic spine showed no abnormalities. (R.227-28).  Dr. DeLuca diagnosed "acute work-related thoracolumbar muscle strain".  He prescribed physical therapy and Flexeril, a muscle relaxant, to afford Plaintiff relief from his back pain. Dr. DeLuca opined at that time that Plaintiff should experience complete relief in 60-90 days.  (R.228-29).  Dr. DeLuca also completed a form at that time stating that Plaintiff could return

to work provided he be given a sit/stand option and not be required to lift or carry more than 25 pounds.  (R.551).

On June 4, 2013, some 22 months after Plaintiff's first encounter with Dr. DeLuca, Plaintiff returned.  Dr. DeLuca's records of that visit indicate that Plaintiff presented with a non-antalgic (normal) gait and could heel and toe walk normally. Plaintiff did have some low back tenderness but his reflexes remained symmetric, his motor strength was normal, and his bilateral straight-leg raising test was negative.  Dr. DeLuca concluded that Plaintiff did not require surgery and advised him to enroll in a pain management program.  (R.531-32).

### 2.   Cumberland Physical Therapy.

From September 1, 2011 through October 14, 2011, Plaintiff participated in a physical therapy program three times weekly at the facility of Cumberland Physical Therapy.  His physical therapist stated that his responses regarding his symptomology and daily activities were evasive.  The therapist also noted that Plaintiff exhibited "normal objective measurement findings", full cervical range of motion, and that he performed various exercises without complaints of pain.  Plaintiff was discharged from the program due to a lack of progress.  (R.231-58).

### 3.   Dr. Craig Fultz.

Dr. Fultz, an orthopedic surgeon, saw Plaintiff on three occasions between September 1, 2011 and November 23, 2011.  Dr.

Fultz read x-rays of Plaintiff's thoracic and lumbar spine to indicate moderate degenerative lumbar changes.  Dr. Fultz found on all three of his sessions with Plaintiff that he demonstrated mild diffuse tenderness in his thoracolumbar spine.  He found also that Plaintiff's reflexes were symmetrical, that he exhibited no muscle spasm, that he had no palpable trigger points, and that he had no sensory or motor deficit.

Dr. Fultz prescribed Aleve, Flexeril and physical therapy. His notes indicate that Plaintiff was non-compliant in failing to take his Aleve and that his physical therapy records demonstrated inconsistencies.  Dr. Fultz opined that Plaintiff required no surgery and recommended an MRI study before he would perform a functional capacity evaluation of Plaintiff.  Plaintiff did not return.

**4.   Dr. John Grandrimo**

Dr. Grandrimo, an osteopath, treated Plaintiff on five occasions from February through June of 2012.  Dr. Grandrimo's impressions of Plaintiff's condition during this period consistently indicated intact sensation, a slightly positive straight-leg raise on the left and negative leg raise on the right, tenderness across the low back, and slightly decreased lumbar range of motion.  Dr. Grandrimo prescribed Voltaren and a Medrol pack. (R.299-409, 470-519).

At the time of Plaintiff's last visit with Dr. Grandrimo in

8

June of 2012, Dr. Grandrimo noted that an MRI of Plaintiff's lumbar spine taken one month earlier revealed "mild degenerative changes" and a "small L5-S1 right paracentral disc protrusion with an underlying annular tear".  Dr. Grandrimo opined, however, that the aforementioned disc protrusion was not causing Plaintiff's pain. He concluded that surgery was unnecessary and recommended that Plaintiff enroll in a pain management program.  (R.297-309).

Physical therapy records that are contemporaneous with the Plaintiff's treatment by Dr. Grandrimo indicate that Plaintiff stated repetitively that he could bathe, dress, drive, travel, perform light housework, and prepare meals independently. Plaintiff also reportedly indicated that he could vacuum, sweep, and mop if he took his time.  Plaintiff reported improvement in his symptoms with use of a TENS Unit.  He was discharged from physical therapy in June of 2012 due to the therapist's perception that he had plateaued.  (R.332-345).

### 5. **Dr. Stephen Morganstein.**

One month after being discharged from the physical therapy sessions prescribed by Dr. Grandrimo, Plaintiff presented to Dr. Morganstein, a pain management specialist, in July of 2012. Plaintiff advised Dr. Morganstein that he exercised regularly at home, used a TENS unit, and wore a lumbar brace to alleviate his symptoms.  Dr. Morganstein's examination of Plaintiff disclosed that Plaintiff: (a) walked with a normal gait; (b) had full motor

9

strength; (c) had full range of motion, normal muscle tone, and no muscular atrophy in his legs; (d) had restricted range of motion in his thoracolumbarlumbar spine without instability or spasms in the spinal muscles; (e) had normal and symmetric deep tendon reflexes; and (f) had intact sensation to light touch and symmetric range of motion in his hips.  Dr. Morganstein advised Plaintiff to continue with his home exercise regimen and prescribed Neurontin.  At the time of his second, and last, visit with Plaintiff, Dr. Morganstein wrote a refill of Plaintiff's prescription for Neurontin.  (R.413-23; 520-27).

### 6.   Dr. John Kline, Jr.

In October of 2011, slightly more than two months after Plaintiff's work-related injury, Plaintiff's Workman's Compensation carrier sent him to Dr. Kline for an independent medical evaluation.  Dr. Kline reported that Plaintiff told him that he performed all activities of daily living independently and denied any use of an assistive device.

Dr. Kline's examination findings included that Plaintiff had a normal gait, good to excellent balance, and could perform tip toe, heel, and tandem walking.  While Plaintiff did exhibit diffuse tenderness to palpation throughout his spinal regions, he had no evidence of muscle spasm, trigger points or reduced range of motion.  Dr. Kline found that Plaintiff had normal motor strength and reflexes and that his seated and supine straight-leg raising

10

tests were both negative.

Dr. Kline concluded that Plaintiff displayed positive Waddell's signs [2], moderate symptom exaggeration, poor effort on validity testing and moderate to high symptom exaggeration or inappropriate pain behavior for the anatomic injury Plaintiff alleged to have experienced.  Dr. Kline's final assessment was "resolved thoracolumbar sprain/strain".  Dr. Kline also executed a form on which he stated that Plaintiff had made "a full and complete recovery" without functional restrictions.  Finally, Dr. Kline stated that Plaintiff could perform his pre-injury job full-time without restrictions. (R.245-46; 558-64).

   **C.   ALJ's Decision.**

The ALJ's Decision (Doc. 10-2) was unfavorable to the Plaintiff.  It included the following Findings of Fact and Conclusions of Law:

         1.   The claimant meets the insured status

---

[2] Waddell's signs include the following inappropriate symptoms: pain at the tip of the tail bone; whole leg pain; whole leg numbness; whole leg giving way; intolerance of or reactions to treatment; emergency admissions to hospital with back trouble.  Waddell's signs also include the following inappropriate signs: tenderness to superficial touch, especially in areas not corresponding to anatomical pattern; pain on pressing down on patient's head (axial loading); pain on rotation of entire body (verses rotating at waist); pain on pressure on flexor tendons at sides of knee (pressure on sciatic nerve); distraction, e.g., discrepancy between ability to touch toes while sitting and standing and discrepancy between straight leg-raising while sitting and supine; complaints of weakness or sensory disturbances that do not correspond to anatomical patterns; and overreactions to examination, such as groaning, grimacing, and clutching body parts.  Goodman, Orthopedic Disability and Expert Testimony 43 (4th e.d. 1993), citing Main and Waddell, The Detection of Psychological Abnormality in Chronic Low Back Pain Using Four Simple Scales," Current Concepts in Pain 10-15 Vol. 2, 1984).

requirements of the Social Security Act through
December 31, 2016.

2.  The claimant has not engaged in substantial
gainful activity since August 9, 2011, the
alleged onset date.

3.  The claimant has the following severe
impairments: severe impairments: degenerative
joint disease and degenerative disc disease of
the lumbar spine.

4.  The claimant does not have an impairment or
combination of impairments that meets or
medically equals the severity of one of the
listed impairments in 20 CFR Part 404, Subpart
P, Appendix I. (20 CFR 404.1520(d), 404.1525
and 404.1526).

5.  After careful consideration of the entire
record, the undersigned finds that the claimant
has the residual functional capacity to perform
the full range of light work as defined in 20
CFR 404.1567(b).

6.  The claimant is unable to perform any past
relevant work.

7.  The claimant was born on December 2, 1961 and
was 49 years old, which is defined as an

12

individual closely approaching advanced age, on the alleged disability onset date.

8.  The claimant has at least a high school education and is able to communicate in English.

9.  Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 9, 2011 through the date of this decision.

## III. Disability Determination Process.

The Commissioner is required to use a five-step

analysis to determine whether a claimant is disabled.[3]  It is necessary for the Commissioner to ascertain: 1) whether the applicant is engaged in a substantial activity; 2) whether the applicant is severely impaired; 3) whether the impairment matches or is equal to the requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 CFR §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden,

---

[3]  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less that 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).  The Act further provides that an individual is disabled

> only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A).

then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at the fifth step of the process when the ALJ found there are jobs that exist in the national economy that Plaintiff is able to perform. (R.27).

## IV. Standard of Review

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a

15

quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See Cotter*, 642 F.2d at 706 ("Substantial evidence" can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

710 F.2d at 114.

This guidance makes clear that it is necessary for the Secretary to analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial

16

evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979). In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07. However, the ALJ need not undertake an exhaustive discussion of all the evidence. *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000). "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004). "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Commissioner of Social Security*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d

17

1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." Friedberg v. Schweiker, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. See, e.g., Albury v. Commissioner of Social Security, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing Burnett v. Commissioner, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review.")). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. Matthews v. Apfel, 239 F.3d 589, 593 (3d Cir. 2001).

**V.   Discussion.**

   **A. General Considerations**

   At the outset of our review of whether the ALJ has met the substantial evidence standard regarding the matters at issue here, we note the Third Circuit has repeatedly emphasized the special nature of proceedings for disability benefits. See Dobrowolsky,

18

606 F.2d at 406.   Social Security proceedings are not strictly adversarial, but rather the Social Security Administration provides an applicant with assistance to prove his claim.   Id.   "These proceedings are extremely important to the claimants, who are in real need in most instances and who claim not charity but that which is rightfully due as provided for in Chapter 7, Subchapter II, of the Social Security Act."   Hess v. Secretary of Health, Education and Welfare, 497 F. 2d 837, 840 (3d Cir. 1974).   As such, the agency must take extra care in developing an administrative record and in explicitly weighing all evidence.   Dobrowolsky, 606 F.2d at 406.   Further, the court in Dobrowolsky noted "the cases demonstrate that, consistent with the legislative purpose, courts have mandated that leniency be shown in establishing the claimant's disability, and that the Secretary's responsibility to rebut it be strictly construed."   Id.

## VI.  Plaintiff's Allegations of Error.

The Plaintiff alleges that the ALJ made five errors that individually or in combination justify a remand to the Commissioner for further proceedings.   We shall consider these in turn.

1.   Whether the ALJ Failed to Provide an RFC That is Supported by Substantial Evidence?

Plaintiff contends that the ALJ's RFC determination that he can perform the full range of light work without restriction is unsupported by substantial evidence.   This contention is mainly

premised on the grounds that the ALJ did not allow for restrictions in his ability to sit, stand and carry that are inimical to the Agency's definition of "light work". (Doc. 12 at 14-15).  Plaintiff then cites Social Security Ruling 83-10 as follows:

> "since frequent lifting or carrying requires being on one's feet up to 2/3 of a workday, the full range of light work requires standing or walking, off and on, for a total of approximately six hours of an eight-hour workday.  Sitting may occur intermittently during the remaining time.  The lifting requirement for the majority of light jobs can be accomplished with <u>occasional</u> rather than frequent, stooping.  Many unskilled jobs are performed primarily in one location, with the ability to stand being more critical than the ability to work.  They require use of arms and hands to grasp and to hold and turn objects, and they generally do not require use of the fingers for fine activities to the extent required in much sedentary work." (emphasis added by Plaintiff).

Plaintiff contends that the record conclusively demonstrates that he has been under impairments in his ability to sit or stand for prolonged periods and in his ability to occasionally stoop such that he cannot properly be seen as capable of light work generally.

Specifically, Plaintiff cites Dr. DeLuca's finding of October 12, 2011 that he had difficulty with any prolonged standing or sitting and that he could not stoop or bend.  (Doc. 12 at 15). Plaintiff also points to his testimony before the ALJ that he cannot stand for more than 20 minutes at a time, cannot sit in one place for more than 20-30 minutes at a time, and cannot walk or get up out of a chair without the use of a cane.  (Doc. 12 at 16). Plaintiff asserts that these limitations render the ALJ's conclusion that he can engage in a full spectrum of light work unsupported by substantial evidence.  Finally, Plaintiff states that the ALJ's failure to discuss the side effects of various medications that he has taken since his alleged onset date renders the RFC determination defective as a matter of law.  (Doc. 12 at 18).

Defendant responds that it is the ALJ who is vested with the responsibility to make the RFC determination after evaluating all relevant evident, including the medical records, medical source opinions, and the individual's subjective description of his limitations.  20 CFR § 404.1545(a)(3). (Doc. 17 at 16).  The Defendant then mentions numerous aspects of the record that support the ALJ's finding including:

1.   X-rays of Plaintiff's lumbar and thoracic spines taken a few days after his work-related accident reveal no abnormalities.  A May 2012

21

lumbar spine MRI revealed only "mild" degenerative changes with a small L5-S1 right paracentral disc protrusion with an underlying annual tear.  Radiology reports from May 2013 showed no acute findings and only "minor" mid-lumbar degenerative disc disease.

2.  Plaintiff required only routine and conservative treatment.  His doctors advised him that he was not a surgical candidate.  Instead, they recommended medication, physical therapy, a TENS unit, home exercies, and a back brace.  Plaintiff reported some improvement in his pain symptoms with these conservative measures, but also admitted to not taking pain medication as instructed.

3.  Physical therapy records show that Plaintiff provided evasive responses about his symptoms, daily activities, and functional abilities.  Despite Plaintiff's ongoing pain complaints, he routinely exhibited "normal objective measurement findings" during physical therapy sessions.  While doing the exercises, Plaintiff displayed full cervical range of motion without pain; he also failed to attend his last

appointment.

4.    Physical examinations routinely revealed
      unremarkable findings.  Despite some mild
      diffused thoracolumbar tenderness, Plaintiff
      exhibited intact motor strength, intact
      sensation, a normal gait, normal muscle tone,
      no atrophy in his legs, negative straight leg
      raising bilaterally, the ability to perform
      heel and toe raises without difficulty, and no
      spasticity or tender points.

5.    In October 2011, an independent medical
      examiner, Dr. Kline, opined that Plaintiff had
      experienced full resolution of his
      thoracolumbar sprain/strain and released him to
      full-duty, full-time work without restrictions.
      Dr. Kline reported that Plaintiff demonstrated
      poor or submaximal effort on validity testing,
      a moderate degree of symptom exaggeration on
      pain behavior questionaires, positive Waddell's
      signs, and a moderate to high degree of symptom
      exaggeration or inappropriate pain behavior for
      the alleged anatomic injury.

6.    Plaintiff received no significant ongoing
      treatment since June 2013, over one year before

23

the ALJ issued the decision.

7.    The record failed to establish that Plaintiff's
      use of a cane was medically necessary or
      prescribed by a physician.

8.    Plaintiff remained able to perform a wide array
      of daily activities despite his alleged back
      pain.  He was the primary care giver for his
      wife with Parkinson's disease who could not do
      anything for herself.  He performed light
      household chores daily and shopped for
      groceries, washed laundry, and vacuumed twice a
      week with the help of his nieces and nephews.
      He prepared meals, listened to the radio, and
      read religious books.  He maintained a driver's
      license, drove approximately 50 miles per
      month, and could use public transportation
      without assistance.  He socialized with his
      wife's family sometimes if the location was not
      "too far."  Plaintiff also looked for several
      jobs, including jobs as a truck driver, and
      reported trying to earn money by driving people
      places and collecting cans.

Substantial evidence - - "such relevant evidence as a
reasonable mind might accept as adequate to support a

conclusion" - - is necessary to support the Commissioner's RFC
finding.   Considering the competing arguments here, we cannot
conclude that the ALJ's RFC determination was unsupported by
substantial evidence.   Where the ALJ's finding of fact are
supported by substantial evidence, we must respect those
findings, even though the Court might have decided the factual
inquiry differently.   Cotter, supra, at 704.   The only medical
evidence in the record that tends to establish that Plaintiff
was at any point incapable of gainful activity is the report
that Dr. DeLuca authored on August 12, 2011.[4]   That report
indicated only that Plaintiff was disabled at that time, but
also indicated that Dr. DeLuca did not expect Plaintiff would
have a protracted period of disability.   Rather, Dr. DeLuca
opined that Plaintiff would experience complete resolution of
his symptoms within 60-90 days.

On October 17, 2012, Plaintiff presented for an
independent medical examination by Dr. John Kline.   Dr.
Kline's examination disclosed that Plaintiff's injury, a
thoracolumbar sprain/strain, had resolved and that "the
examinee has had a full and complete recovery."   The record
includes no medical opinion addressing Plaintiff's functional
capacities that postdates Dr. Kline's report.   The balance of

---

[4] Because Plaintiff amended his alleged onset date to December 2, 2015, Dr. DeLuca's report is not, properly speaking, probative that Plaintiff was disabled within the time period for which he seeks benefits.

25

the medical evidence from Drs. DeLuca, Fultz, Grandrimo and Morganstein generally reveals a consistent history indicating that Plaintiff did not require surgical intervention, experienced only mild diffuse tenderness in his thoracolumbar spine, had normal reflexes, exhibited no muscle spasm, had no palpable trigger points, walked with a normal gait, experienced no muscle atrophy, had only minimally decreased lumbar range of motion, and displayed 5/5 motor strength. None of these physicians completed a physical capacity questionnaire regarding Plaintiff and their notes, singly or in combination, cannot be logically read to indicate that Plaintiff was at any point incapable of at least light work. Accordingly, the Court finds that the ALJ's determination that Plaintiff was capable of light work was reasonable and supported by the requisite substantial evidence of record.[5]

**2.   Whether Substantial Evidence Supports the ALJ's Evaluation of the Opinion Evidence?**

Plaintiff asserts that the ALJ improperly elevated the medical opinion of Dr. Kline, a one-time examining physician, over that of Dr. DeLuca a treating physician.  It is true that uncontradicted opinion evidence from a treating physician,

---

[5] The Court notes that Plaintiff's arguments regarding the medical necessity to use a cane or the allegedly limiting side effects of his medications are utterly unsupported in the record. For that reason, the ALJ cannot be faulted for not considering such impairments in his RFC determination.

particularly a treating physician who has had a lengthy
relationship with a patient, is entitled to great or even
controlling weight.  Morales v. Apfel, 225 F.3d 310, 317 (3d.
Cir. 2000).  Yet, the only opinion evidence offered by Dr.
DeLuca describes an expectation of a relatively short (60-90
days) period of disability that does not even extend into the
time frame for which Plaintiff seeks disability.  It is also
significant that Plaintiff saw Dr. DeLuca on only two
occasions and these occasions were almost two years apart.
After his second session with Plaintiff in June of 2013, Dr.
DeLuca noted that Plaintiff presented with a normal gait,
could heel and toe walk normally, exhibited normal reflexes
and motor strength, had a negative bilateral straight leg-
raising test, did not require surgery, and was experiencing
only minimal low-back tenderness.  Dr. DeLuca expressed no
opinion that Plaintiff was to any degree disabled and it would
be unreasonable to read his anecdotal report to indicate that
Plaintiff was suffering disabling symptoms.  Thus, even
standing alone, Dr. DeLuca's treatment notes of his two
sessions with Plaintiff do not establish a period of
disability that had lasted or could be expected to last at
least one year as required by the Social Security Regulations.

Even without considering Dr. Kline's clear opinion that
Plaintiff had experienced a "full and complete recovery", Dr.

27

DeLuca's records do not provide a basis upon which the ALJ could reasonably have directed an award of benefits.  Dr. DeLuca's records indicated, at best, that Plaintiff had a brief period of disability that predated by at least three months his alleged onset date.  Accordingly, the Court cannot fault the ALJ's evaluation of the medical opinion evidence in this case.

3.     **Whether Substantial Evidence Supports the ALJ's Credibility Determination?**

As Plaintiff asserts (Doc. 12 at 22), an ALJ must give "great weight to a claimant's subjective testimony of the inability to perform even light or sedentary work when his testimony is supported by competent medical evidence. Schaudeck v. Commssioner, 181 F.3d 429, 433 (3d. Cir. 1999). This is both true and also unhelpful to Plaintiff.  We have previously recounted the medical evidence that discloses that Plaintiff's examinations over a protracted period of time by at least four separate physicians generally revealed essentially normal findings but for a few findings of mild, diffuse tenderness in the spinal region.  Thus, we find that Plaintiff's testimony regarding his alleged restrictions is not supported by competent medical evidence.

Plaintiff's testimony regarding the degree of his limitations is also seriously compromised by his account of

his daily activities at the sole hearing conducted in this matter.  Other factors that support the ALJ's decision to find him only partially credible include the reports of various physical therapists that he performed without pain, was evasive in responding to questions about his symptoms and daily activities, and that he was able to function independently in terms of driving, bathing, and the ability to do a wide range of housekeeping chores.  These findings compliment his own testimony that he does everything for his wife, who is afflicted by Parkinson's disease, including helping her bathe and use the bathroom.  Finally, Plaintiff's credibility is called into question by Dr. John Kline who indicated that Plaintiff exhibited poor effort while being examined, symptom exaggeration, and inappropriate responses for the anatomic injury Plaintiff had suffered.

It is within the ALJ's discretion to determine whether the Plaintiff's objective complaints are supported by the evidence.  20 CFR § 404.1529(c)(4).  When substantial evidence supports an ALJ's credibility determination it should be afforded "great deference".  Horodenski v. Commissioner, 215 F.App'x 183, 189 (3d. Cir. 2007).  An ALJ's credibility determination is also ordinarily entitled to deference by a district court because "he or she has the opportunity at a hearing to assess a witness's demeanor."  Reefer v. Barnhart,

326 F.3d 376, 380 (3d. Cir. 2003).  Having reviewed the ALJ's explanation regarding why she did not find the Plaintiff fully credible, and mindful of the deference to be accorded to an ALJ's credibility determination pursuant to the cases referenced above, the Court concludes that the ALJ's credibility determination in this case was supported by substantial evidence.

4. **Whether the ALJ Erred by Failing to Find Plaintiff Disabled Pursuant to Medical-Vocational Guideline 201.14?**

Plaintiff's argument on this point is premised on the assertion that: "the medical exhibits of record (T. at 551), as well as Blount's testimony, demonstrate that Blount, at the very most, is capable of only sedentary work and would therefore be disabled under 201.14." (Doc. 12 at 24).  Because the Court has already concluded that the ALJ's determination that Plaintiff could perform the full spectrum of light work is supported by substantial evidence, the Court must reject the argument that the ALJ should have applied Medical-Vocational Rule 201.14.

5. **Whether the ALJ Failed to Establish That There is Work in the National Economy That Plaintiff Can Perform?**

Because the Court has already concluded that the ALJ's

RFC determination that Mr. Blount can perform light work without restriction is supported by substantial evidence of record, the Court concludes that the ALJ did not err by not identifying specific jobs within Plaintiff's capacities.  That would be necessary only had the ALJ found that Plaintiff's ability to perform light work was in some manner restricted and those restrictions eroded the occupational base.  This is not the scenario in this case and, for that reason, the ALJ had no burden to establish the existence of particular jobs that Plaintiff could perform.

**VII. Conclusion.**

For the reasons cited above, the Court finds that each of Plaintiff's assignments of error must be rejected.  An Order consistent with this determination will be filed contemporaneously.

BY THE COURT

S/Richard P. Conaboy
Honorable Richard P. Conaboy
United States District Court

Date: August 1, 2016